Rose Marie **ROBINSON**, by Fannie Robinson, her mother and next friend, and others

v.

**BOARD OF EDUCATION OF ST. MARY'S COUNTY**

and

G. Edward Thomas, President, May Russell, Vice President, Grace Knight, Robert E. Wigginton, Clarence Leo Young, all constituting the members of The Board of Education of St. Mary's County, Maryland, Miss Lettie M. Dent, County Superintendent.

Civ. No. 8780.

United States District Court
D. Maryland, Civil Division.
July 9, 1956.

Tucker R. Dearing, Juanita J. Mitchell, and Robert B. Watts, Baltimore, Md., and Jack Greenberg, New York City, for plaintiffs.

H. Vernon Eney, Robert R. Bair and Venable, Baetjer & Howard, Baltimore, Md., and Arthur L. Rysticken, Lexington Park, Md., for defendants.

C. Ferdinand Sybert, Atty. Gen. of Maryland, and Norman P. Ramsey, Deputy Atty. Gen., amici curiae at the request of the court.

THOMSEN, Chief Judge.

Defendants, the Board of Education of St. Mary's County, the individual members thereof, and the County Superintendent of Schools, have moved to dismiss the complaint filed against them

by sixty-six Negro children, through their parents and next friends, for a declaratory judgment and an injunction restraining defendants from "requiring these Plaintiffs and all other Negroes of public school age to attend or not to attend public schools in St. Mary's County because of race".

## The Pleadings

This is a class action brought under the Civil Rights Acts, Title 42 U.S.C.A. § 1981 et seq., to redress the alleged deprivation, under color of state statute, ordinance, regulation, custom or usage, of rights, privileges and immunities secured by the Fourteenth Amendment to the Constitution of the United States and the Civil Rights Acts. Plaintiffs allege that solely because of their race and color they are forced to attend racially segregated schools; that some of them are forced to travel greater distances than the distances to the nearest schools for white students; and that two schools for Negroes, the Banneker and Jarboesville schools, are greatly inferior to the schools maintained in St. Mary's County for white students. At a pre-trial conference, counsel for plaintiffs stated that they are not claiming any rights based upon the alleged inequality of the schools or the distances traveled, but are contending that these alleged facts should be considered in deciding whether a prompt and reasonable start has been made to desegregate schools in St. Mary's County. This understanding was confirmed at the hearing on the motion to dismiss.

The complaint further alleges that on or about September 23, 1955, plaintiffs petitioned the County Board to abolish segregation in the schools of St. Mary's County, but that the Board refused to desegregate the schools within its jurisdiction at that time, and has not devised a plan for such desegregation; that by continuing racial segregation in said schools defendants are denying plaintiffs their right to enjoy non-segregated education "as soon as practicable"; that plaintiffs are threatened with irreparable injury; and that they have no plain, adequate or complete remedy to redress these wrongs other than this suit for injunction.

The motion to dismiss is based upon the contentions:

That this court lacks jurisdiction: (a) because it does not appear that plaintiffs have suffered or are threatened with irreparable injury, (b) because plaintiffs have a clear, adequate and complete remedy at law in the state courts by way of mandamus, and (c) because plaintiffs have a clear, adequate and complete administrative remedy by way of appeal to the State Board of Education;

That the complaint fails to state a claim against defendants upon which relief can be granted: (a) because it does not appear that defendants are acting in bad faith or are abusing their discretion in temporarily continuing the administration of the publc schools of St. Mary's County on a segregated basis, (b) because this court should decline to take jurisdiction rather than interfere with state administrative agencies, and (c) because this suit is premature, in that it does not appear that desegregation of the public schools of St. Mary's County will not be accomplished within a reasonable time.

Defendants also seek dismissal of the action insofar as it requests the court to order defendants to present promptly to the court a plan of desegregation, because such a request is in essence a petition for a writ of mandamus, which this court is without power to grant in a case such as this.

## The Stipulation

The parties have filed a stipulation of facts and have agreed that the stipulation and attached exhibits may be used in whole or in part by any of the parties at the hearing on the motion to dismiss, or in connection with any other preliminary motions which may be made by any party, or at the trial of this case on the merits. Both sides, however, have re-served the right to offer additional evidence at any future hearing. The stipulation shows the following facts, among others:

On May 26, 1954, the State Board of Education issued a statement in reference to the first opinion of the Supreme Court in Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, in which the Board stated:

"* * * Until the conditions of the decision are made known finally, with the mandate and decree of the Supreme Court, any detailed plan of action for implementation would be premature. This statement does not imply, however, that the State Board of Education and the local school authorities, upon whom the major burden of solving the problem will fall, should delay in analyzing the situation and making plans for implementing the decision of the Court.

\* \* \* \* \* \*

"The detailed problems in respect to implementing the decision of the Supreme Court will rest primarily upon the local boards of education. The problems involved in any program of integration will vary among the different school systems of the State, * * *.

"The role of the State Board of Education is not to set the detailed pattern of operation but to take an official position that the decision will be implemented with fairness and justice to all, and with due regard for the professional aspects of the program. Further, its responsibility is to act in a general over-all supervisory nature to insure that standard, equitable practices are followed throughout the State."

Shortly after the second opinion in Brown v. Board of Education, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083, the Attorney General of Maryland delivered an opinion, addressed to the State Superintendent of Schools, advising him that all constitutional and legislative acts of Maryland requiring segregation in Maryland public schools are unconstitutional and must be treated as nullities.

The Attorney General referred to "the legal compulsion presently existing on the appropriate school authorities of the State of Maryland to make '* * * a prompt and reasonable start' toward the ultimate elimination of racial discrimination in public education".

On June 22, 1955, the State Board of Education and the Board of Trustees of the State Teachers' Colleges of Maryland adopted a joint resolution.[1] After recognizing that the law of the land as announced by the Supreme Court automatically abolished all State laws "which raised any distinction according to race in the public school system of the State of Maryland and of its local subdivisions", the statement continued:

"2. Segregation according to race is hereby abolished in all of the State Teachers Colleges of Maryland. * * *

"3. The Supreme Court recognized, and the State Board of Education recognizes, that factual conditions vary in different localities throughout the State, * * *. Such conditions may include public school building facilities, locations of the same with respect to population density of residential areas, transportation problems, teaching staffs, and other local and geographic conditions if applicable and pertinent to the transition from segregation to integration.

"4. The State Board * * * (on) May 26, 1954, recommended that the local public school officials evaluate their respective local conditions and problems in anticipation of the final decision of the Supreme Court. All of the County public school officials have made or are making such studies. Now that The Supreme Court has passed its mandate and has directed compliance with its decree with deliberate speed and with due regard to local conditions and in conformity with equi-

---

1. The members of the State Board of Education, together with the State Superintendent of Schools, comprise the Board of Trustees of the State Teachers' Colleges.

table considerations, the State Board of Education calls upon the local public school officials to commence this transition at the earliest practicable date, with the view of implementing the law of the land. Voluntary compliance with deliberate speed, without the necessity of Court compulsion, is advised on the part of all local public school officials throughout the State.

"5. The Staff of the State Department of Education shall cooperate in all possible ways with local public school officials to give effect to the law of the land in the process of the transition from segregation to desegregation."

On June 20, 1955, the County Board of Education and the County Commissioners of St. Mary's County appointed a Citizens' Committee, composed of sixteen white members and five colored members, to study local school problems and cooperate with and advise the County Board of Education in the formulation of a plan to abolish racial discrimination in the public schools of St. Mary's County. The full Committee met twelve times between August 2, 1955, and June 11, 1956, and additional meetings were held by a subcommittee. The Committee rendered an interim report in March, 1956, and a final report on June 11, 1956. The final report recommends a plan for transition to a racially non-discriminatory system of public schools in St. Mary's County by permitting integration in the elementary public schools on a voluntary basis, with the approval of the County Superintendent of Schools, if facilities are available, beginning September, 1957. Integration in transportation is recommended only when the County Board feels that satisfactory integration has been accomplished in the classrooms. The report discusses at length the various problems involved. The Committee was unanimous in recommending that transfers should not be made prior to September, 1957, but divided nine to eight, with one abstaining and two absent members,

on the question whether desegregation should begin in the elementary schools or in the high schools. The County Board of Education is studying the report but has not yet acted on it.

At the request of the St. Mary's County chapter of the NAACP, a special meeting of the County Board was held on September 27, 1955. Delegations from the chapter and from the PTA of the Jarboesville school called upon the County Board to take "prompt and reasonable action" with "deliberate speed" with reference to the problem of segregation, and to remedy certain congested conditions at the Jarboesville school. There was presented to the County Board a petition signed by ninety-one persons, including the parents of many of the infant plaintiffs in this case, calling upon the Board "to take immediate steps to reorganize the public schools under your jurisdiction on a non-discriminatory basis" so as not to deny admission to or require attendance of any child at any school solely because of race and color.

On October 6, 1955, the County Superintendent wrote the chairman of the Jarboesville PTA advising him of the means proposed to relieve congestion of the Jarboesville school and of the policy of the County Board concerning integration. This policy was reiterated on November 8, 1955, in identical language, as follows:

"1. The Board of Education of St. Mary's County, Leonardtown, Maryland, accepts the Supreme Court's decision of May 31, 1955 that 'racial discrimination in public education is unconstitutional'.

"2. The Board of Education will confer with the Citizens' Committee selected by the County Commissioners and the Board of Education on June 20, 1955, in studying ways in which we may best proceed towards ultimate integration of our schools.

"3. For the year 1955–56, the public schools of St. Mary's County will remain on a segregated basis."

The Public School Laws of Maryland

The applicable Maryland statutes are contained in Article 77 of the Annotated Code of Maryland 1951. Sec. 1 provides for "a general system of free public schools" throughout the State. Sec. 2 provides: "Educational matters affecting the State and the general care and supervision of public education shall be entrusted to a State Department of Education, at the head of which shall be a State Board of Education." Sec. 3 provides: "Educational matters affecting a County shall be under the control of a County Board of Education."

Sec. 16 provides: "The State Board of Education shall, to the best of their ability, cause the provisions of this Article to be carried into effect. They shall determine the educational policies of the State; they shall enact by-laws for the administration of the public school system, which when enacted and published shall have the force of law. For the purpose of enforcing the provisions of this Article, and the enacted and published by-laws of the Board, the State Board of Education shall, if necessary, institute legal proceedings. The State Board of Education shall explain the true intent and meaning of the law, and they shall decide, without expense to the parties concerned, all controversies and disputes that arise under it, and their decision shall be final; * * *."

Sec. 17 provides that the State Board "shall exercise, through the state superintendent of schools and his professional assistants, general control and supervision over the public schools and educational interest of the State; they shall consult with and advise, through their executive officer and his professional assistants, county boards of education, boards of district school trustees, county superintendents, supervisors, attendance officers, principals, teachers, and interested citizens, and shall seek in every way to direct and develop public sentiment in support of public education." Secs. 34 and 35 provide that the State Superintendent shall enforce all the provisions of Article 77 and of the enacted and published by-laws of the State Board, and that he shall execute the educational policies of the State Board.

Sec. 48 requires the County Boards "to maintain a uniform and effective system of public schools throughout their respective counties." By Sec. 50 the County Superintendent is made the executive officer, secretary and treasurer of the County Board. Sec. 51 provides: "The county board of education shall to the best of its ability cause the provisions of this Article, the by-laws, and the policies of the state board of education to be carried into effect. Subject to this Article, and to the by-laws, and the policies of the state board of education, the county board of education shall determine, with and on the advice of the county superintendent, the educational policies of the county and shall prescribe rules and regulations for the conduct and management of the schools." By Sec. 58 the County Board is required to "consolidate schools wherever in their judgment it is practicable, and * * * pay, when necessary, for the transportation of pupils to and from such consolidated schools."

Sec. 84 provides that elementary schools "shall be free to all white youths, between six and twenty years of age." Sec. 124 provides: "All white youths between the ages of six and twenty-one years shall be admitted into such public schools of the State, the studies of which they may be able to pursue; provided, that whenever there are grade schools, the principal and the county superintendent shall determine to which school pupils shall be admitted."

Sec. 143 provides: "The county superintendent of schools, as the executive officer of the county board of education, shall see that the laws relating to the schools, the enacted and published by-laws and the policies of the State board of education and the rules and regulations and the policies of the county board of education are carried into effect." Sec. 144 provides: "The County Superintendent of Schools shall explain the true intent and meaning of the school laws,

and of the by-laws of the State Board of Education. He shall decide, without expense to the parties concerned, all controversies and disputes involving the rules and regulations of the county board of education and the proper administration of the public school system in the county, and his decision shall be final, except that an appeal may be had to the State Board of Education if taken in writing within thirty days. * * *"

Secs. 207 and 208 make it the duty of the County Board "to establish one or more public schools in each election district for all colored youths, between six and twenty years of age, to which admission shall be free * * *; provided, that the colored population of any such district shall, in the judgment of the county board of education, warrant the establishment of such a school or schools"; and that "schools for colored children shall be subject to all the provisions of this Article."

## Discussion

I. The first opinion in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, makes it clear that the infant plaintiffs have suffered and are threatened with irreparable injury as a result of being required to attend segregated schools. But the second opinion, 349 U.S. 294, at pages 299–300, 75 S.Ct. 753, at page 756, stated:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. * * *

"In fashioning and effectuating the decrees, the courts will be guided by equitable principles. Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. * * * At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a systematic and effective manner. But it should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them."

It should be noted that both the Maryland State Board and the St. Mary's County Board have accepted without question the constitutional principles announced by the Supreme Court.

The second opinion in Brown v. Board of Education continued:

"While giving weight to these public and private considerations, the courts will require that the defendants make a prompt and reasonable start toward full compliance with our May 17, 1954, ruling. Once such a start has been made, the courts may find that additional time is necessary to carry out the ruling in an effective manner. The burden rests upon the defendants to establish that such time is necessary in the public interest and is consistent with good faith compliance at the earliest practicable date. To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary

in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system. During this period of transition, the courts will retain jurisdiction of these cases." 349 U.S. at pages 300–301, 75 S.Ct. at page 756.

■ II. (a) The fact that plaintiffs might have sought a writ of mandamus in a state court, instead of filing this suit, does not deprive this court of jurisdiction. "Barring only exceptional circumstances, see e. g. Gilchrist v. Interborough Rapid Transit Co., 279 U.S. 159, 49 S.Ct. 282, 73 L.Ed. 652, or explicit statutory requirements, e. g. 48 Stat. 775, 50 Stat. 738, 28 U.S.C. § 41(1), 28 U.S.C.A. § 41(1), resort to a federal court may be had without first exhausting the judicial remedies of state courts. Bacon v. Rutland R. Co., 232 U.S. 134, 34 S.Ct. 283, 58 L.Ed. 538; Pacific Tel. & Tel. Co. v. Kuykendall, 265 U.S. 196, 44 S.Ct. 553, 68 L.Ed. 975." Lane v. Wilson, 307 U.S. 268, at pages 274, 275, 59 S. Ct. 872, at page 875, 83 L.Ed. 1281. No exceptional circumstances or statutory requirements prevent such resort to a federal court in this case. On the contrary, the Civil Rights Acts specifically grant such jurisdiction. 42 U.S.C.A. §§ 1983, 1988. See also 28 U.S.C.A. §§ 1331, 1343.

■■ (b) It is true that this court has no jurisdiction to issue a writ of mandamus or other order requiring defendants to present a plan of desegregation. As I read the second opinion in Brown v. Board of Education, quoted above, any Negro child who claims that he is being denied his constitutional rights by being required to attend a particular school because of his race or color may file his complaint in the appropriate federal court. Then, subject to established equitable principles, such as the requirement that a plaintiff must exhaust his administrative remedies before he is entitled to an injunction, the court will consider the various elements referred to by the Supreme Court in the passage quoted above, including the adequacy of any plans which defendants may propose. It is for the school authorities to decide whether or not they will propose a plan. After considering all of the elements, the court will enter such orders or decree as may be appropriate.

■ III. In two recent cases involving segregation in public schools the Fourth Circuit has reiterated that "it is well settled that the courts of the United States will not grant injunctive relief until administrative remedies have been exhausted." Carson v. Board of Education of McDowell County, 4 Cir., 227 F. 2d 789, 790; Hood v. Board of Trustees of Sumter County School District No. 2, 4 Cir., 232 F.2d 626. In the former case, after citing many Supreme Court cases supporting the rule, the Fourth Circuit continued:

"This rule is especially applicable to a case such as this, where injunction is asked against state or county officers with respect to the control of schools maintained and supported by the state. The federal courts manifestly cannot operate the schools. All that they have the power to do in the premises is to enjoin violation of constitutional rights in the operation of schools by state authorities. Where the state law provides adequate administrative procedure for the protection of such rights, the federal courts manifestly should not interfere with the operation of the schools until such administrative procedure has been exhausted and the intervention of the federal courts is shown to be necessary." 227 F.2d at page 790.

In the Carson and Hood cases the respective states, North Carolina and South Carolina, have established clear and adequate administrative remedies, by statutes enacted after the decision in Brown v. Board of Education. These remedies include the right of appeal from school personnel or district trustees to the appropriate county or city board of education, with the right of appeal from the

county or city board to the Superior Court of the county in North Carolina, and to the Court of Common Pleas of the county in South Carolina. The usual right of appeal from judgments of the county courts is also recognized.

The Maryland law is not so clear. The relevant provisions of the Maryland Code have been set out above. The State Board has statutory jurisdiction over questions arising out of administrative problems in the county schools. Its decision over matters within its jurisdiction is "final". As stated in Wiley v. Board of School Commissioners of Allegany County, 51 Md. 401, this is a visitatorial power "and wherever that power exists, * * * (it) is comprehensive enough to deal with the questions involved in an existing controversy * * * Courts of equity decline all interference, and leave the parties to abide the summary decision of those clothed with the visitatorial authority." This principle has been stated in similar terms in Shober v. Cochrane, 53 Md. 544; Underwood v. Board of County School Commissioners, 103 Md. 181, 63 A. 221; Zantzinger v. Manning, 123 Md. 169, 90 A. 839; Board of School Commissioners of Caroline County v. Morris, 123 Md. 398, 91 A. 718; Board of School Commissioners of Caroline County v. Breeding, 126 Md. 83, 94 A. 328; and Coddington v. Helbig, 195 Md. 330, 73 A.2d 454. There is an exception where the exercise of discretion by the State Board is "fraudulent or corrupt or such abuse of discretion as to amount to a breach of trust." Coddington v. Helbig, 195 Md. 330, 337, 73 A. 2d 454, 456.

On the other hand, the Court of Appeals of Maryland has made it equally clear that legal questions are not to be determined by the State Board of Education, but that a party aggrieved by the action of a County Board may go directly to a court without the necessity of an appeal to the State Board of Education. Duer v. Dashiell, 91 Md. 660, 47 A. 1040; Board of School Commissioners of Anne Arundel County v. Henkel, 117 Md. 97, 83 A. 89; County Board of Education for Washington County v. Cearfoss, 165 Md. 178, 166 A. 732; Hobbs v. Hodges, 176 Md. 457, 5 A.2d 842, 121 A.L.R. 1468.

Viewed realistically, most of the cases cited involved both administrative problems and questions of law. The Court of Appeals seems to have treated them as purely administrative problems or purely legal problems contrary to their true hybrid nature. But the test to determine which element shall control is elusive.

Plaintiffs argue that the question whether desegregation is being effected in a constitutional manner is a legal question, which should be determined by a court, under the Maryland rule. They claim that they have the right to have a federal court pass on that question at this time, in view of the fact that the County Board on October 6, 1955, and again on November 8, 1955, refused to abolish segregation during the school year 1955–56, and has not yet adopted a plan for the future. Defendants argue that the decision involves many administrative problems, with which the State Board is more familiar than a court can be; that plaintiffs have an adequate administrative remedy by way of application to the principal or County Superintendent for admission to the school of their choice, and appeal to the State Board from any decision of the County Superintendent adverse to their application.

Sec. 124 of the Maryland statute provides that "whenever there are grade schools, the principal and the county superintendent shall determine to which school pupils shall be admitted." This statute on its face applies to "All white youths between the ages of six and twenty-one years". A different provision exists for colored children. Secs. 207, 208. The effect of the decision in Brown v. Board of Education, however, was to strike the word "white" out of sec. 124, and to give the County Superintendent the right to determine to which school Negro children as well as white children shall be admitted.

The Attorney General of Maryland is the legal adviser to the State Board of Education. I requested him to appear as amicus curiae in this case, and to present his opinion on the following questions: (1) Is there a right of appeal to the State Board of Education from the refusal by a County Board of such a request as is alleged in paragraph 5 of the complaint?[2] (2) Assuming (a) that the St. Mary's County Board takes no further action before September, 1956, or (b) that it adopts the recommendation of the Citizens' Committee—if a Negro child applies for admission to a white school and is denied admission by the County Superintendent does such child have a right of appeal (a) to the County Board, or (b) to the State Board, or (c) to neither, his remedy being in the courts?

Pursuant to my request the Deputy Attorney General appeared at the second hearing on this motion and presented the following opinion: (1) No appeal lies to the State Board from the action of a County Board; but an appeal does lie to the State Board from the action of a County Superintendent who has decided a controversy or dispute; and since the County Superintendent is the executive officer of the County Board, in practice it often amounts to the same thing. (2) A Negro child whose application to attend a particular school is denied by the County Superintendent would have a right of appeal to the State Board, but not to the County Board. He cited, in support of this opinion, secs. 16, 124, and 144 of the Public School Law.

■ Since May 31, 1955, a number of the counties in Maryland have adopted rules or regulations permitting any child regardless of race to make individual application to be admitted to any school, admissions to be granted in accordance with such rules or regulations as the County Board may adopt and with regard to the available facilities in such schools.

On June 3, 1954, immediately after the first opinion in Brown v. Board of Education, a somewhat similar rule was adopted by the Board of School Commissioners of Baltimore City, which under the home rule provisions of the Maryland Constitution is not subject to the visitatorial authority of the State Board of Education. It may be that the Board of Education of St. Mary's County will adopt some such rule. But whether or not such a rule is adopted, I concur in the opinion of the Attorney General that individual Negro children now have the right to apply under sec. 124 for admission to a particular school, and that from the decision of the County Superintendent on such application an appeal lies to the State Board. Whether the refusal of such an application would also give an immediate right to file proceedings in a state court to determine any question of law involved, or to file proceedings in this court to review any alleged deprivation of constitutional rights, might depend upon the reason or reasons for such refusal. But I hold that the Maryland law does provide adequate administrative procedure for the protection of plaintiffs' constitutional rights.

■ IV. Plaintiffs contend that they are entitled to a declaratory judgment or an injunction based upon the action of the County Board on the petition presented to it in September, 1955, by ninety-one persons, including many of the adult plaintiffs, parents of the infant plaintiffs in this case. The nature of that petition and of the action taken by the County Board has been set out above. It is true that no appeal lay to the State Board from the action of the County Board on that petition. But that does not mean that the petitioners did not have an adequate administrative remedy, by application for admission to the school of their choice and appeal from an adverse decision of the County Superintendent thereon.

---

2. I. e. the petition filed by the parents of some of the infant plaintiffs, together with others, requesting the County Board to take immediate steps to reorganize the county schools on a non-discriminatory basis, so as not to deny or require attendance at any school solely because of the race or color of the child.

■ It is not necessary to decide in this case whether the petitioners had any remedy in the state courts as a result of the action of the County Board on their petition. Nor is it necessary to decide at this time whether this court can ever grant relief in such a case before the plaintiffs have appealed to the State Board. I am satisfied that under all the circumstances of this case the court should not issue an injunction against the County Board or the County Superintendent until the plaintiffs have exhausted their administrative remedy by appealing to the County Superintendent for admission to the school of their choice, and appealing to the State Board from an adverse decision. Brown v. Board of Education, supra; Carson v. Board of Education, supra; Hood v. Board of Trustees of Sumter County School District No. 2, supra, and cases cited therein.

■ St. Mary's County is the southernmost county in Southern Maryland, agricultural, slow to change. Its traditional pattern has been disturbed during the past fifteen years by the establishment of the Patuxent Naval Base. Serious problems exist with respect to school facilities and transportation. The appointment of the Citizens' Committee in the summer of 1955 and its conscientious study of the problems during the past school year constituted a prompt and reasonable start toward compliance with the Supreme Court's ruling.

■ That committee has now reported, and the County Board is studying its recommendations. No doubt the County Board will take some action, adopt some plan, during the summer. I intimate no opinion with respect to the sufficiency of the plan recommended by the committee. As the Supreme Court said: "School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles". 349 U.S. at page 299, 75 S.Ct. at page 756. The County Superin-

tendent, the County Board and the State Board, through their respective counsel, have stated that they will give prompt attention to any application, petition or appeal filed by or on behalf of Negro students. If the final decision of the school authorities is adverse to such applicants, or if it is unreasonably delayed, they may apply to this court or to the appropriate state court for any relief to which they may be legally entitled.

The motion to dismiss the complaint is hereby granted, with leave to the plaintiffs or any of them to file an amended complaint on or before November 15, 1956; provided, that if they or any of them shall have an application, petition or appeal pending before the County Superintendent, the County Board or the State Board on September 15, 1956, he or they may file such amended complaint at any time until sixty days after the State Board shall have ruled on the question presented by such application, petition or appeal.